In the Matter of GRIBBIN SUPPLY COMPANY, INC., Bankrupt.

No. BK 3–1132–C.

United States District Court, N. D. Texas, Dallas Division.

Feb. 14, 1974.

Dr. A. J. Sosebee, claimant.

Jay W. Ungerman, Ungerman, Hill, Ungerman, Angrist, Dolginoff & Teofan, Dallas, Tex., for petitioning creditors.

## MEMORANDUM OPINION

WILLIAM M. TAYLOR, Jr., Chief Judge.

This is a Petition of Review of an Order of Referee Elmore Whitehurst. The Order asked to be reviewed is a Judgment against Petitioner Sosebee in the sum of $75,025.00 on a counterclaim filed by the Trustee to a claim filed by Petitioner. The Referee had jurisdiction of the counterclaim as it is a compulsory counterclaim under F.R.Civ.P. Rule 13(a).[1] The Judgment of the Referee was final October 12, 1970. Petitioner filed his petition within the ten day period allowed by § 39c of the Bankruptcy Act on October 21, 1970. Therefore, this Court has jurisdiction of the controversy.

Petitioner has erroneously relied on the proposed Findings of Fact and Conclusions of Law filed by the Trustee in

1. See Nissho American Corp. v. Humphreys, Trustee, 445 F.2d 1096 (5th Cir. 1971).

prosecuting this petition. This is unimportant as the findings and conclusions of the Trustee when compared to the proposed findings and conclusions state essentially the same particulars. Because of this substantial identity, Petitioner has addressed himself to the action taken by the Referee and his particular statements of error are applicable. The statements are sufficiently particularized as to the grievances that Petitioner believes he has.

Petitioner had been the friend of Edward Gribbin for some years when Mr. Gribbin wanted to form a plumbing supply house to be partially owned and to be principally operated by him. Petitioner agreed to go in with Mr. Gribbin. Bankrupt, Gribbin Supply Company, Inc., was then formed in February, 1966, with Gribbin (and wife), Petitioner, Petitioner's sister, and Gribbin's parents-in-law as stockholders. One hundred thousand shares of stock were subscribed to at the price of one dollar per share. Petitioner owned 15,000 shares and his sister owned 10,000. Also, he was the subscriber of another 32,500 shares which he never paid for and were never issued to him. These 25,000 shares of stock made Petitioner the majority stockholder in Bankrupt.[2] He also was Vice President and a Director of Bankrupt. On August 26, 1966, Edward Gribbin died. His wife succeeded him as President within a few days. The widow and her parents and Petitioner were soon at controversy. Petitioner offered to buy out the other owners/directors but was refused. The parties dickered as the company came apart. It was finally agreed that Petitioner would be the one to leave, relinquishing his ownership, directorship and office. Petitioner's attorney drew up an agreement for the sale of Petitioner's shares. This agreement was entered into on or about January 20, 1967, and signed by Petitioner, Mrs. Jackie Gribbin, and B. R. Coupland. This agreement is the subject of our controversy.

■ All of the many assignments of error of Petitioner boil down to one contention of his that the Referee did not accept. Petitioner characterizes the agreement as being between him as seller and Gribbin and Coupland as buyer. The Court cannot say that the Referee was clearly erroneous under Bankruptcy Rule 810 as to his findings of fact supporting his conclusion that Petitioner's construction of the agreement is wrong and that of the Trustee is correct. The Court agrees that the construction of the agreement by the Trustee that the agreement was between Petitioner Sosebee as seller and Bankrupt as buyer is correct.

Petitioner contends that paragraph VII of the agreement[3] gives the construction of him as seller and Gribbin and Coupland as buyer. This paragraph does not set out the basic bargain or the parties to the agreement. It only involves a peripheral agreement as to a right to a cause of action by one party against two of the others.

Paragraph I of the agreement does set out the basic bargain and the parties. It says, in part: *Sosebee* agrees to sell, transfer, assign and deliver all of this twenty-five thousand (25,000) shares in Gribbin Supply Company, Inc., to Gribbin, Coupland and/or Gribbin Supply Company, Inc. . . . There is uncontroverted testimony that this agreement

---

2. Petitioner acted for his sister under a power of attorney. She is inconsequential to this controversy as will be more fully explained hereafter.

3. "The failure of *Gribben* and *Coupland* to abide by the terms of this agreement and to pay the cash consideration as set forth above by no later than January 27, 1967, gives rise to *Sosebee's* right to enforce this agreement by way of specific performance or to bring action for damages as he so elects. However, this covenant is not applicable to limit the right of action by *Sosebee* for injunction or other similar equitable relief in connection with the operation of said corporation should Gribben and/or Coupland default on the terms of this agreement with regard to the payment of the cash consideration on or before January 27, 1967, as set out above."

was principally drawn up by Petitioner's attorney. Petitioner also does not deny signing the agreement. He is therefore hard put to deny his knowledge of the terms of the contract.

None of the parties to the agreement signed it with any particular capacity shown. But this is only a small problem if one at all. Paragraph IV of the agreement provides that Petitioner shall receive one-half of the recovery of Gribbin Supply Company, Inc., that it may have against the insurance carrier who insured the company against the death of the company's President, Edward Gribbin, Jackie Gribbin, Edward's widow, and her father, B. R. Coupland, could not have signed away the company's rights in their individual capacities. They had to be signing the contract individually, and as representatives of the company. Any other reading would cause the contract to fall and would put Petitioner in the same position he now is in.

■ This written agreement was not the entire agreement of the parties. Petitioner testified before the Referee, he was leaving the company entirely. Besides the items that were taken care of by the written agreement, there were two important matters to be cleared up. First was Petitioner's subscription for an additional 32,500 shares in Bankrupt. Second was Petitioner's and his sister's Directorships and offices in Bankrupt. The minutes of Bankrupt show that Petitioner was released of his subscription January 20, 1967. They also show that he had resigned his Directorship as of an unspecified date. Petitioner never did submit his resignation in writing. The exact date of his resignation is of little moment. The reason for this is

the written agreement, the release of the subscription and his resignation are all one integrated transaction. They were all part of the same scheme to end Petitioner's interest in Bankrupt. It would be a triumph of form over substance if a person who was in Petitioner's position could perform the steps of their plan of disengagement from a corporation in such an order so that they could avoid the consequences of their actions. No matter how these actions were taken, they were part and parcel of one transaction which has serious consequences in law.

■ V.A.T.S. Bus.Corp.Act, art. 2.03 sets several restrictions on the purchase of its own shares by a Texas corporation, which Bankrupt was.

The one that we are most concerned with is:

> "F. In no case shall a corporation purchase its own shares when there is a reasonable ground for believing that the corporation is insolvent, or will be rendered insolvent by such purchase or when, after such purchase, the fair value of its total assets will be less than the total amount of its debts."

A Certified Public Accountant who has testified in similar matters before, testified before the Referee that Bankrupt was not paying its bills as of the time of the purchase of the shares, that Bankrupt was insolvent as of that date, assets were less than debts and there was no surplus in the treasury. Therefore, the shares were purchased illegally.[4]

Directors have liability for this type of transaction affixed against them by V.A.T.S.Bus.Corp.Act, art. 2.41(A)(2).[5] Petitioner did not vote for or against the purchase of the shares by Bankrupt. But it would be hard to think of a more

---

4. The remainder of this article restricts the purchase of a corporation's shares by it to purchase out of various types of surplus of the corporation. So in any event, the transaction was illegal because there was no surplus.

5. "Directors of a corporation who vote for or assent to the purchase of its own shares

contrary to the provisions of this Act shall be jointly and severally liable to the corporation for the amount of consideration paid for such shares which is in excess of the maximum amount which could have been paid therefor without violating the provisions of this Act."

**668**

appropriate situation for the use of the word assent as used in this article. Petitioner was the seller of these shares, this is more than assent, this is participation.

 Petitioner contends that he was no longer a Director when this sale took place and in any event had no knowledge of the condition that the corporation was in at that time. As said above, a person in Petitioner's position cannot resign his Directorship, sell his stock to the corporation and then contend he has no liability. These acts were integrated. Petitioner bailed out of Bankrupt and did various acts as part of a common scheme. It would be a fraud on our laws if Petitioner were allowed to resign his Directorship in the morning, sell his shares to the corporation in the afternoon and claim no liability for the sale. Petitioner's contention of no knowledge as to Bankrupt's financial condition as of the date of the sale belies his own testimony that he was not happy with the way Bankrupt was being run and bailed out because of his concern for the financial condition of Bankrupt. Petitioner was acting because of what he believed to be notice of the poor financial condition of Bankrupt. He will not be heard to suggest a lack of knowledge of the reason for which he says that he entered into the illegal contract.

According to Texas law [6] the Director's liability is to the corporation, not its creditors. Therefore under § 70a(6) of the Bankruptcy Act, the Trustee was vested with the right to the Bankrupt's action against Petitioner.

Under Texas law, it is clear that receivers, assignees for benefit of creditors and trustees in bankruptcy can sue to collect unpaid stock subscriptions.[7] The theory is that such unpaid subscriptions are a trust fund for the creditors. As there was no consideration given for the release from the subscriptions, it was a fraud on the

creditors as of that date and the Trustee may sue on their behalf under § 70e of the Bankruptcy Act.

In conclusion, the findings of fact of the Referee are not clearly erroneous and the Court is in accord with his conclusions of law.

The Court is of the opinion that the Judgment of the Referee be in all things affirmed.

6. Blond Lighting Fixture Supply Co. v. Funk, 392 S.W.2d 586 (Civ.App.1965) no writ history.

7. Fulton v. Abramson, Trustee, 369 S.W.2d 815 (Civ.App.1963).